May it please the Court, Your Honors, John Fowle on behalf of the appellant. I would request to reserve five minutes for rebuttal. This case involves a $3 million life insurance that Gabrielian purchased from Lafayette Insurance Company. And to move maybe to some of the key issues, there is an issue as to whether the Why is it relevant whether it's $3 million or $3,000? You know, it probably isn't, Your Honor. I'm kind of prejudiced. You're right, Your Honor. $3 million sounds better. I'm sorry, Your Honor. That'll get you a garage at some point. Did this whole dispute start with his attempts to convert the policy? Is that where it begins? I think so, and there's an issue. Gabrielian submitted e-mails requesting the information about the conversion, indicating he wanted to convert. This is in, I think, the summer of 2010. And there's an issue as to when he got the responses. He believes he didn't get the responses timely or the applications timely to submit it within the five-year period. So that certainly is one significant issue on the appeal. And he claims he did give them the e-mails and correspondence indicating he wanted to convert the policy. And we believe a close reading of the policy would indicate that that, in fact, does trigger the conversion. The policy language on the conversion does not indicate that a specific application has to be filed within five years or specific. It doesn't detail what procedural matter will be. You wanted him to figure all that out? Well, that is our position. And the policy doesn't tell you how to actually go about filing an application to convert the policy. What about the insurance company's responsibility to inform them? Well, and that's our position as well, that not only does the insurance company have an obligation to inform them, but when it regards a benefit or losing a benefit such as this conversion to whole life or cash value, that they must give the insured Gabriellen specific notice of the date that this time period will no longer be subject to conversion. So that's also an issue that we have raised in regard to. So as we get to the end of 2010, he fails to make a payment. And that's the next issue, and that concerns Lafayette's lapsing the policy. Gabriellen makes a payment in November 28, 2010, and then there's an issue whether Lafayette lapsed the policy timely or not, and there's an issue. Now, we have raised, and we did not represent Mr. Gabriellen at the district court level, but have raised at the appellate level what we believe is an exception to the general rule that an argument not made at the district court level can be raised at the appellate level when it involves an issue that is just a matter of law or interpretation of law. And it's our position that as to this lapse, the issue is there's no issue. Lafayette did not lapse the policy. They lapsed it. They did not give him 61 days to. Everybody agreed in the district court that it was lapsed in 30 days. Correct. Everybody agreed in district court. That's the way the district court operated. You can't change the theory now. Okay. Well, that's our. At least in my view, you can't. I mean, you told the district court in the statement of uncontroverted facts that it was only 30 days. Well, I won't proceed further on argument. We've set out that argument and our position on that. So, look, the district court granted summary judgment. She said, I think it was a she. I forget who did it. But that there was no tribal issue of fact. Correct? That's what the court said. So, in your view, where are there genuine factual disputes that would show that the district court erred in its conclusion? Fair enough, Your Honor. I believe there are several. The first one would be as to the district court struck the affidavit of Mr. Gabriella that was submitted in response to the summary judgment, indicating that it was basically a sham affidavit, that it was different than what he had testified to in his deposition. And we have discussed that issue and cited the case law that would support that that affidavit should have been accepted. There were e-mails and correspondence that supported that Gabriella had, in fact, submitted issues to the insurance company about this conversion in the summer of 2010. In his deposition, which actually occurred several years after 2010, he basically said he wasn't sure when he made the request for the conversion and he didn't know. He submitted in an affidavit, basically, after reviewing his correspondence and submitting the correspondence with the summary judgment that, in fact, he had discussed with Lafayette via this correspondence the issue of wanting conversion of the policy in the summer of 2010. So we believe that that affidavit from Mr. Gabriella should have been part of the record and should have been considered on the motion for summary judgment. So that would create a travel issue of fact as to whether or not he timely raised the issue of conversion. Correct. In August of 2010. Yes. Or prior to that August deadline. The 28th date. Correct. That's the one issue of fact. How about at the end on the lapsing issue? Where's the factual dispute there? Well, on the lapsing issue, and that goes back to what we want to raise on the new that was not raised at the trial court, but we believe constitutes an issue of fact because there are no disputed issues on lapsing at the trial court. Lafayette lapsed the policy less than 60 days, and we believe that the only evidence before the court was this insurance contract that had the 60-day lapsing period. Let me ask you this. I mean, I'm not asking this properly, or you're not familiar with the record sufficiently, but I thought Mr. Gabriellen had been paying his monthly premiums with the automatic deduction. Oh, I'm sorry, Your Honor. Yeah, that's the preauthorized withdrawals. Yes. They had used that. They had used those, and that is another issue we have. Right. To get money from him to pay the premiums, and when he filled out those forms, he didn't specify the amount. And then at the end here, they say, well, we're not going to use this form anymore because you didn't specify the amount. And I can respond to that. He wants to get his mother's premium. They do. And that's what you use. Yeah. And Mr. Gabriellen had a history with Lafayette of using these preauthorized withdrawal documents, and he would sign them and send them in, and frequently it would just have the policy number and not a specific amount. The policy language specifically indicates it does not suggest you have to fill out the amount of the premium. It indicates that, in fact, the company, Lafayette, should take whatever is owed on the particular policy and premiums and withdraw it, and that's what they've done in the past. And he had submitted – Had they ever rejected – prior to this last one that gets us at the end, had they ever rejected those preauthorization forms? No. Not that the record suggests they never rejected these before. Then you started to worry about, was there enough money in there? If we put in a request, there's not enough money. It's going to embarrass him and take the credit, you know, and now you're starting to cuddle him and worry about him. Yeah, and I think what – Doesn't he – I read someplace he was suffering from Alzheimer's. You know, I'm not sure it was Alzheimer. He had a variety of health issues and I believe had submitted a claim under the waiver provision in the policy that if you have health issues, that would waive the premium. So there was some health issues. I'm not sure it was Alzheimer's, Your Honor, but he did have some health issues. But to get back to these preauthorized withdrawals, there certainly is an issue of fact that they had been used by Mr. Gabriellen in the past. They had not been filled out specifically. Now all of a sudden in January of 2011, Lafayette wants a multitude of details on them, though their policy doesn't require that. The policy suggests they can be submitted. It was signed. It had the policy information on it. And all they had to do at that point was go to the policy, see what was owed in premium, and use the withdrawal as they had in the past to do it. So we believe that that creates an issue of fact and that this policy should not have been lapsed because had Lafayette properly used those preauthorized withdrawals, the policy would have been properly paid up to date. All right. You wanted to save some time. Thank you. You're down to three and a half minutes. Okay. May it please the Court, Jeffrey Tong on behalf of Appelli, the Lafayette Life Insurance Company. What's important in this appeal as well as the underlying case is that what's at issue here is merely just a contract. The contract imposes obligations on both parties. Here, Mr. Gabrielian, the appellant, is actually trying to impose, transfer those obligations to the insurance company. The two issues here, whether the lapse, it arose from a failure to pay premiums. That was Mr. Gabrielian's obligation to the policy. The second issue in the case is whether he had the ability to convert the policy to a whole life policy. Again, that's an obligation. Let me ask you. Is that the opportunity? I'm not into life insurance and whatnot, but I gather the opportunity to convert from a single term policy to a whole life policy, that that's a significant benefit? Does that mean you don't have to have a medical exam or something? Your Honor. Why does somebody care about that? The change is a type of policy. A term life policy is a- A term policy, you create no value. If you have a whole life, you pay your premium and you create value. That's the difference. Judge Pregerson is correct. A term life policy is a set set of time that accumulates no cash value. Insurance is in place for a set amount of time for a set amount of premium. If you convert to a whole life policy, two things happen. One, you accumulate cash value on the policy. It can extend up to the lifetime instead of a set term. I see. One significant difference is the premium changes dramatically- Goes up. Depending on your age. But as you pointed out, Your Honor- As you get older, the premium goes up. Can, Your Honor? There are two types, one where the premium is level and one where- But for him, this was a significant- In his estimation for him, it was a significant benefit, the opportunity to convert. It could be, Your Honor. It was. It has to be. What do you mean it could be? It depends on your situation. If you are insurable, it might be cheaper to get another term in life. It's a life insurance policy. If you're not insurable, then the ability to convert might be a valuable benefit, yes. Well, if he thought- He must have thought there was some value to it because he's made a federal case out of it. Well, Your Honor, Mr. Gabrillion obviously has been involved in a number of federal cases. Well, anyway, so as I understand the policy, he had through- given his age, he had five years to convert, right? Yes, Your Honor. So that date sort of rolled around about the end of August of 2010? Yes. Okay. Now, there's a dispute about whether or not he notified the company in August of 2010 that he wanted to convert, right? Isn't there some sort of dispute about that? Mr. Gabrillion contended in a declaration, which Judge O'Connell believed and struck from the record, be disregarded as a sham affidavit in which he contended that he contacted the company and requested an application to convert the policy. Now, the key issue here, though, is even assuming that that was true and was entered into the record and considered by Judge O'Connell, that doesn't mean that you converted within the time frame. You can ask for a number of applications throughout the whole period of time of five years, but unless you timely submit the application and it's processed in a group, there is no conversion. So where was he notified that his letter-I mean, let's assume he establishes that he contacted and said, I want to convert. Let's assume he does that. He's able to do that. That's right. Why wouldn't that be sufficient to trigger his right of conversion? Because the right of conversion is not triggered by the request for the application. What you're telling me, is that in the policy, Judge Ferguson? No. The policy tells you that you have the ability to convert within five contract years. So you have the ability to convert. Now, the process themselves is an application processed by the company. Mr. Gabrielian did not submit an application until January of 2011. Even when he did submit an application, he dated it October 27th. Hold on a second. What additional information is required in an application to convert other than that I want to convert? Your Honor, what's required is that the calculation of the premium and an acknowledgement that you are going to be responsible for the premium at that time. Well, doesn't that mean when you submit the application, you get a bill for your monthly premium goes up, what, from, I don't know, $1,000 to $5,000? Yes, possibly, Your Honor. But, you know, an issue in the case is whether he pays his premium. Well, we're not there yet. Here, you know, the premium is going to be significant. And significant in the fact that you can see that he submitted in January what he thought the premium was. And that was $12,000 a month for the conversion. So when he submitted his application, he had some idea what the – so that $12,000 a month. The opportunity to convert here must be valuable to pay $12,000 a month for life insurance. It is if you believe that you want the policy to continue for the rest of your life, Your Honor, and that you want to pay the $12,000 a month for the rest of your life. Well, I'm not sure I follow you. So he got a term life insurance policy, and he was told that he could convert it after, you know, he had five years to convert, huh? The whole life. Yes. Okay. And so what did that give him? Tell him that you got a term, and within five years, a certain date, you can convert the whole life. What benefits did that give him? Well, it's a good question, Your Honor. And I think the context of that question needs to be put in place with the parties here. Mr. Gabrielian was a licensed insurance broker and agent in the state of California for 25 years. He, at the time that he took out this policy, was an appointed agent of the Lafayette Life Insurance Company. He knew, was trained about these products, about the procedures of the company. He knew contact people at all levels of the company, as shown by the record about how his inquiries were directed. So to say that he did not have a sufficient knowledge of this is really not a correct assumption. He got a copy of the policy. He got a duplicate copy of the policy. He understood the policy. He sold these policies. So for him to say, I didn't know that I didn't have five years to convert when it's in the policy itself, or for him to conversely say, I didn't know I had to pay premiums, or I didn't know I had the timely, it rings hollow. I mean, I hate to say it, but when you have such a sophisticated insured, he should not be coming back to say, well, I didn't do this or I didn't know that. So sometime in July or later in the summer that he actually did submit an application, or that there's no doubt that he then notified, even you will recognize it, at some point he said, I want to convert. Yes, he submitted an application in January of 2011. He obtained that application by calling an insurance broker, another broker, a brokerage, which is affiliated as appointed as a broker for Lafayette Life. He got the conversion application that way, submitted it. He submitted it and dated it October 27th, 2010, which is outside of the five-year period. So it's unclear why he dated it October 27th, 2010, but the bottom line still becomes that he submitted it in January 2011, which is outside the five-year window. The date of the application he submitted is outside of the five-year window. This is the last question I have on this, but as Judge Pregerson alluded to earlier, why wouldn't for the insured, whether you're a sophisticated insured or just some person who has this particular policy, why wouldn't the insurance company notify you as you get to the end of the five-year period, say, hey, if you want to convert this policy to a whole life policy as allowed under the policy, you've got until August, whatever the date is, to file an application. If you want an application, contact us, and we'll send it to you. Your Honor, he was sent a number of letters periodically, and it's undisputed in the record. He, at his deposition, didn't deny receiving these letters, but the correspondence from the company, one was sent in June of 2008, June of 2009, and June of 2010, advising him that he had a right to convert per the policy, and he doesn't deny receiving these letters. So he did get notice in addition to the – Well, that would sort of support his notion that he contacted you in August and said, hey, I want to convert. Maybe he didn't submit the application, but he – Well, maybe, but not necessarily. I mean, again, he got one in 2008, 2009, and 2010, and there was no request for – Well, maybe he didn't want to start paying $12,000 a month. Well, that's a possibility, but if you convert earlier, then your premiums are lower because your age is lower. Let me switch to the end of the lapsing of the policy and the reinstatement period and whatnot. Why isn't there a factual dispute over whether or not he actually paid the premiums by following the course of conduct and giving the insurance company an authorization to deduct his payments from his bank account? Number one, because he absolutely made no payment. From the last payment received by the company was October 28, 2010. After that date, he made absolutely no payment. So even given the opportunity after the question that was raised with the authorization form, he made no payment. The company corresponded with him, told him that we have questions about the authorization form, explained them in a letter to him, which he acknowledged receiving, provided him an extended window within which to pay up to February 11, 2011. There was no response. There was no payment. There was no new form. In the past, they had used these authorization forms to pay his premiums. Isn't that right? Yes. And he hadn't specified the amounts in the authorization forms. Isn't that right? That's correct. So why was it so significant this time that his failure to put in a precise amount or amounts was fatal to utilizing those forms? Two reasons, Your Honor. One, he was in arrears. At the time he had the other ones, what was due was the next month's premium. At this time, he was also in arrears, so the question came up, do you want what's going to get you current? Do you want what's normally payable, which is get you current plus the next month's premium, number one. Number two, he also included his mother's policy on the same form. The mother's policy is a variable-like policy in which the premium can change, excuse me, periodically based upon the performance of the investments which it's in. So without specifying the amount of that policy as well as how you would want to divide up any premium that's withdrawn per the form, the company is guessing. You're placing them in a position where they have to guess that because of the variable policy this much is withdrawn. I thought he used one of those, either here or his mother, used one of those forms for his mother's policy at a prior time. He, at the form that's at issue, he put both policies. Yes, but I thought there was one where they were separate just for the mom. I'm sorry, I don't. A separate authorization form pertaining to his mother where they didn't have the amount. I may be mistaken on that. I may be confusing them. No, it's not in the record in terms of how the payments were before on the other policy. The other policy was, I understand, was billed periodically just because of the variable nature of the premium. Well, he just gave you that form. I don't know whether that one left the amount blank, but you did get them, but they were blank. And then the company, Lafayette, filled it in the correct amount. A letter was sent to Mr. He was really saying that, well, let's take care of my mother's as well. That's what he was saying when he wrote her policy number. I think that could be assumed, Your Honor, but the amount that needs to be withdrawn from the account is unknown. And that's what's unclear. Without knowing the amount, we could have overdrawn his account. We could have paid more than he wanted to, as I said, because the amount that was at issue in terms of his policy was more than just next month's premium. You could always call the bank and say, we've got an authorization here, and we're going to fill it out, and we want to send it in. Is there enough money to cover it? I'm out of time, Your Honor. Is it okay if I respond to that? No, I mean, you can answer Judge Ferguson's question. We didn't have authorization to contact the bank. We had authorization to withdraw money. What do you mean? You can't call a bank? You can't find a person's balance unless you have an authorization from the bank in order to allow you to ask what the balance of that person's account is. But it still doesn't allow you to know how much that person wants withdrawn. If Mr. Gabrillion had a car payment due or a mortgage due and X amount of dollars was taken out and it resulted in ---- He had given the insurance company a check for $12,000 earlier, correct? No, that was until January of 2011. That was in connection with the conversion. My only point, I guess what I want to ---- I mean, just a check for $12,000 on his account suggests that he might have some money in his account. But that was unknown to the company. Well, I mean, he still gave you a check for $12,000. He did, but that was much, many months later than the issue of what should have occurred. Thank you. Thank you, Your Honor. That was helpful. Just very briefly to respond, if I might. In regards to these authorization forms, they had the mother's policy number and Gabrillion's policy number and authorized removal for the premiums. The policy itself, and we cite the language in our brief, specifically indicates that the company can take out what money is due and owing on the policy, whether it's one month, two months, they can take it out. Rather than doing that, they decide within a month later that they lapse the policy. If they would have followed their own policy language and taken the money out per the authorization, which they'd done in the past, they would not have been in a position where the policy would have lapsed. And we believe that that constitutes a breach. There's a material issue of fact on that that should preclude the summary judgment. Well, as a practical matter, if the policy, if we were able to obtain the fixed life policy, you know, the policy that builds up. The whole life. The whole life. The whole life, yes. Yes, Your Honor. The whole life, yes. The whole life policy. Would Lafayette have been armed in any way? Would they have lost money in any way? They would be getting. Why would they not want to do it? I don't know. They'd be getting a bigger premium. And the reason that that whole life policy is potentially appealing to an insured is that, and Mr. Gabriellen had actually paid over $60,000 on the term policy, which if that policy lapses, that money is just gone. It's gone. But if you convert to the whole life, though, the premiums are more. He's getting a little older. Now that's like having an annuity. You have a cash value on it, so you build up. It's an investment at that point. So it is a benefit. And it's something that he did tell them he wanted in a timely fashion. So why wouldn't they want to give it to him? I don't know the answer to that, Your Honor. To make more money. They would make more money, yeah. And he's a young fellow. Well, he's in his 40s then. He might have been later 50s, I think, at that point.  Yeah, I agree with you, Your Honor. I agree with that. He's very young. Yeah. I agree. You know, I actually remember one time when I was practicing law. This guy was killed in a crosswalk accident. And he'd been paying like a nickel a week, you know, for life insurance. And you read the insurance policies. And, you know, you're trying to figure it out. And it kind of read like, well, if you miss a payment, the nickel, or you haven't sent one in nickels in for a month, that's the end of it. Nothing. Goodbye. And somebody I know who I grew up with who was in the insurance business, I showed it to him. He said, well, just send it in. See what happens. So I sent it in with death certificates. They paid it right like that, you know. And then I've had other cases involving insurance companies where they were paying out. And I wondered, why were they paying out? Nobody's paying attention anyway in those insurance companies. Well, I don't know, Your Honor. I must say I agree with you. It's a lot of money and all of this. I just don't understand why they wouldn't be happy unless there's something behind this all that we don't know about. Why they wouldn't be happy just to have them come in and get out a whole life policy. No. I asked that question. I didn't get an answer. Well, and I agree with you on that, Your Honor. And I think just to recap, we believe that there were material issues of fact present, and I won't go through all of them again. And we would ask that the court reverse the district court's decision and remand it for trial. Okay. Thank you. All right. Thank you very much, counsel. We appreciate your arguments.
judges: Pregerson, Noonan, Paez